UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOSEPH PETERSON                                              CIVIL ACTION

VERSUS                                                       NO. 21-2027

TRAVIS DAY, WARDEN                                           SECTION "D"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing § 2254 Cases. Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.[1] For the following reasons, I recommend that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

## I.    FACTUAL BACKGROUND

Petitioner Joseph Peterson is a convicted inmate incarcerated in the B.B. Rayburn Correctional Center in Angie, Louisiana.[2] On October 29, 2014, Peterson was charged by a bill of indictment in Plaquemines Parish with two counts of aggravated incest occurring between January 1, 2011 and October 15, 2012.[3] Peterson pled not guilty on December 8, 2014.[4] On May

---

[1] A district court may hold an evidentiary hearing only when the petitioner shows either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence (*id*. § 2254(e)(2)(A)(ii)) *and* the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. *Id*. § 2254(e)(2)(B).

[2] ECF No. 1, at 1.

[3] State Record Volume (hereinafter "St. R. Vol.") 6 of 16, at 32-33, Bill of Indictment, 10/29/14. In 2014 aggravated incest was re-designated as an aggravated crime against nature. La. Rev. Stat. § 14:89.1. *See* 2014 La. Sess. Law Serv. Act 177 (H.B. 530); *see, e.g.*, *State v. Benoit*, 237 So. 3d 1214, 1216 n.3 (La. App. 5th Cir. 12/29/17).

[4] St. R. Vol. 6 of 16, at 2, Min. Entry, 12/8/14.

30, 2017, Peterson was charged in a second bill of indictment with an additional count of aggravated incest occurring between December 1, 2012 and August 1, 2013.[5]  Peterson pled not guilty to that charge on June 12, 2017.[6]  The Louisiana Fourth Circuit Court of Appeal summarized the established facts as follows:

> On October 19, 2012, the nine year-old victim, A.A., reported to her fourth grade teacher, Erin Cosse, that she was being sexually abused by her stepfather, the defendant.  Ms. Cosse testified that A.A.'s school behavior had changed in the preceding week and that she had asked A.A. if anything was wrong.  At the end of the class day, A.A. told Ms. Cosse she was ready to tell her what was wrong and asked to speak with her in the hallway.  A.A. then told Ms. Cosse that the defendant was sexually abusing her.  Upon receiving this information, Ms. Cosse brought A.A. to the school nurse, Rebecca Amos.

> Ms. Amos testified that Ms. Cosse brought A.A. to her office and stated only that A.A. had something she needed to tell her.  Ms. Amos asked A.A. what was wrong, at which time A.A. reported that her stepfather, the defendant, was sexually abusing her.  Ms. Amos asked A.A. to explain what she meant by that; and A.A. responded that the defendant showed her videos of men and women naked together and that the defendant "touches me with my clothes off."  When asked how recently the touching had occurred, A.A. stated "last Monday."  When asked if she had told anyone else, A.A. stated that she talked to her mother about "the situation", and her mother told her not to tell anyone outside the house about it.  A.A. also said she had told her sister, Lexi, who told her to "stop saying that stuff."  At that point, Ms. Amos contacted the Plaquemines Parish Sheriff's Office ("Sheriff's Office"), along with the school principal and counselor.

> Captain Mark Plumer testified that on October 19, 2012, he was employed by the Sheriff's Office as captain of the Criminal Investigations Bureau.  On that date, the office received a call from the Belle Chasse Primary School that a student had reported being sexually abused by her stepfather.  Capt. Plumer, Detective Tiffanie Provenzano, and a patrol officer were immediately dispatched to the school to investigate the reported sexual abuse.

> Upon arriving at the school, Capt. Plumer interviewed school personnel while Det. Provenzano spoke with A.A. and her mother.  After gathering initial statements at the school, the officers decided to relocate to the Sheriff's Office with A.A. and her mother to conduct further investigation.  Based on the statements made by A.A., Capt. Plumer applied for a search warrant of the residence where A.A. lived with her mother and the defendant.  Specifically, the search warrant

---

[5] St. R. Vol. 14 of 16, at 14, Bill of Indictment, 5/30/17.
[6] *Id.* at 2, Min. Entry, 6/12/17.

sought computers, computer equipment, and any external hard drives, based on statements from A.A. that the defendant had shown her pornographic videos and images on his computer.

Capt. Plumer identified several photographs taken at the residence during the execution of the search warrant; he described photographs taken in the master bedroom that depicted sexual lifestyle magazines, a box of sex toys, and commercial pornographic videos. In regard to the computer equipment evidence, Capt. Plumer identified photographs showing the large Hewlett-Packard ("HP") laptop computer and an external hard drive that officers located in the defendant's work area and seized as evidence.

Captain Plumer stated that no family members were home during the execution of the search warrant. In fact, during that time, the defendant voluntarily presented himself at the Sheriff's Office. Capt. Plumer stated that the defendant denied having any knowledge as to why A.A. would make sexual abuse accusations against him and he volunteered to leave the family home. The defendant also volunteered to undergo a polygraph test. However, the polygraph exam did not go forward because, according to the polygraph examiner, a medical condition that caused twitching in the defendant's muscles could skew the results, making the test unreliable.

Tracey Brunetti testified that in October 2012, she was employed by the Child Advocacy Center in New Orleans as a child forensic interviewer. On October 22, 2012, she conducted a videotaped interview with A.A., which was offered, introduced, and played during Brunetti's testimony. During that interview, A.A. informed her that the defendant forced her to watch videos on his computer. A.A. described one video showing two naked women and one naked man. A.A. stated that the defendant "constantly" showed such videos to her, and that the defendant also encouraged her to watch such videos on her smaller computer. A.A. further stated that she saw a photograph depicting her mother and the defendant having sex.

A.A. relayed to Brunetti that on the previous Monday or Sunday, which would have been October 15th or 14th, the defendant told her to lie next to him on the couch. She stated that, at that time, her mother was at the store and her sister was in her room. During this episode, the defendant put his hand on her vagina and placed her hand on his penis. The touching took place over their clothing.

Brunetti asked A.A. to indicate on anatomical drawings of the female and male bodies where the defendant had touched her body and where she had touched his body. On the female diagram, A.A. circled the body parts where the defendant had touched her, including her vagina, her breasts, and her belly button; and A.A. stated that the defendant touched these body parts both over and under her clothing. On the male diagram, A.A. placed stars on the male body parts, including his penis,

chest, and buttocks, where the defendant forced her to touch him, both over and under his clothing.

Brunetti testified that during the interview A.A. cupped her hand and moved it up and down to show the type of manual stimulation she performed on the defendant's penis. A.A. stated that she had done this to the defendant more than once and that, after she did that, a white substance came out that the defendant referred to as pus. In addition, A.A. stated that sometimes the defendant touched inside her vagina and sometimes he had her get on top of him and put his penis inside her vagina.

Detective Holly Hardin testified that she is employed by the Plaquemines Parish Sheriff's Office, assigned to the special victims unit. She described herself as "the juvenile detective, the sex-crime detective, and domestic-violence detective." In March 2017, she was contacted by the Attorney General's office and asked to coordinate a second forensic interview of A.A. as part of an investigation into allegations that the defendant had sexually abused A.A. again in 2013. Det. Hardin scheduled A.A. to undergo a forensic interview at the Child Advocacy Center in New Orleans.

At the time of the second videotaped forensic interview, on March 13, 2017, A.A. was fourteen years old and in eighth grade at Belle Chasse School. A.A. stated that, after the first series of sexual abuse incidents, the defendant returned to the family home and, approximately six months later, the abuse happened again. She stated that it occurred in the summertime of 2013, when she was ten or eleven years old. Once again, the abuse took place on the family couch and, this time, she was alone in the house with the defendant. A.A. stated that the defendant placed his hand on her vagina and he forced her to put her hand on his penis. She stated that the touching took place under their clothing. She described it as uncomfortable when he touched her. She recalled that this incident in the summertime might have been the last incident of sexual contact with the defendant, and that the defendant ultimately moved out of the family home and she had not seen him for two to three years.

Dr. Ellie Wetsman, who was accepted as an expert in child-abuse pediatrics, testified that she saw A.A. on November 7, 2012, after the first report of sexual abuse, but she did not perform a physical examination. Dr. Wetsman noted that a physical examination had been performed at Children's Hospital on October 19, 2012, and there was no physical evidence of sexual abuse. Dr. Wetsman explained that such a finding is not unusual in child sexual abuse cases because that part of the body "stretches" and most child abuse perpetrators are gentle because they do not want to cause physical injury.

Dr. Wetsman opined that most children do not report sexual abuse immediately after it happens. Dr. Wetsman explained that, often, the child does not know that what is happening is wrong, or the child is made to feel that she is at

fault, or the child is threatened that if she tells something bad will happen; and, consequently, when a child victim of sexual abuse does report the incident, she will often report only a portion. Dr. Wetsman likened it to "test[ing] the waters" to see if the story is believed or to see if something will happen with her family. If the initial disclosure goes well, the child will gradually feel more comfortable telling the rest of the story. Dr. Wetsman also opined that it was not unusual for a child not to remember the details of each instance of abuse when she has been abused multiple times.

Dr. Wetsman did physically examine A.A. on March 22, 2017, after the second report of abuse. The results of that examination were normal. Dr. Wetsman also took a narrative from A.A., who informed her that she had been abused by the defendant once or twice since the last time Dr. Wetsman had interviewed her. A.A. stated that the abuse took place when she was alone in the house with the defendant and consisted of him touching her vagina and forcing her to touch his penis. When asked whether the defendant had ever hurt her, A.A. answered affirmatively, explaining that he had tried to "stick" his penis in her vagina but that "it did not go in all the way."

A.A. herself also testified. At the time of the trial, she was fifteen years old and in ninth grade at Belle Chasse High School. She testified that she was five years old when she first met the defendant and six or seven years old when the defendant married her mother and they lived together as a family.

A.A. recalled reporting to her fourth-grade teacher in October 2012, that she was being sexually abused by the defendant. She testified that, by the time she reported the abuse in October 2012, the abuse had been going on "for a couple of years." She admitted that she did not have a perfect memory of everything that had happened between her and the defendant. When asked how many times the abuse had taken place, she testified that it had occurred more than five times; but, she was unsure if it had happened more than ten times. When asked to explain what the defendant had done to her, A.A. testified that the defendant would touch her and make her touch him. She explained further that the defendant would touch her vagina under her clothes and he would make her touch his penis. The defendant also touched her vagina with his penis, but that occurred "only a couple of times."

A.A. testified that the defendant also made her watch pornography. She explained that he would "pull [the pornography] up on his computer and sit [the computer] in front of me and leave the room and tell me to watch it." She stated that he also showed her photographs of himself and her mother in sexual situations. While watching the pornography, the defendant would often have her change into her robe with no clothes on underneath and he would touch his penis until "white stuff would come out."

After reporting the sexual abuse in October 2012, A.A. remembered that the defendant moved out of the house, but moved back in a few months later, in

December 2012. She explained that she knew having the defendant move back in would make her mother and sister happy. She also recalled that the defendant had given the family a dog before he moved back in. At some point after the defendant moved back in with the family, he began sexually abusing her again. Although she could not recall the dates, she knew that it happened after he moved back in because she had the dog by this time. She stated that the defendant started touching her in the same ways that he had before he had moved out.

A.A.'s mother testified that she was shocked when A.A. told her that the defendant had showed her naked pictures on his computer, but she stated that she took no action because they were economically dependent on the defendant, so she advised A.A. to "hang tight." The mother admitted, however, that sometimes the defendant was alone in the house with A.A. The mother explained that A.A. had never personally told her that the defendant was abusing her, only that he had forced her to watch pornography on his computer.

The mother recalled being called to A.A.'s school on October 19, 2012, and thereafter, going to Children's Hospital so A.A. could be questioned and examined. At that point, the defendant moved out of the house, but, subsequently, moved back into the family home. Even after the initial report of problems, the mother stated that A.A. was sometimes left alone in the house with the defendant.

The mother stated that initially she did not want to believe her daughter's sexual abuse claims, but she realized that her daughter was not lying and had no reason to lie because coming out with the truth caused them significant financial hardship. The mother admitted that she never witnessed the defendant sexually abusing A.A. or showing her pornography. However, she had witnessed the defendant viewing pornography on his computer and stated that sometimes she watched pornography with him in their bedroom.

The mother also testified that A.A. had told lies in the past, often about "minor things" such as cleaning her room, washing her clothes, taking a bath, or washing her hair.

Tran Buie Pogue, a digital forensic examiner with the Louisiana Attorney General's Office, testified that she became involved in the instant case in June, 2013. At that time she was given the defendant's laptop computer and external hard drive and told to look for "anything relating to sexual behavior, anything inappropriate in nature."

In performing her duties, Pogue obtained a printout of the computer's internet history. Pogue highlighted the entries which represented a pornographic website, xnxx.com. There were numerous highlighted entries and each entry, Pogue explained, represented a link and each link led to a story. There were additional links to xnxx.com on the defendant's smart phone.

Pogue proceeded to read out the titles of eighty-six pornographic stories that the defendant had accessed. Pogue explained that "user Joey Peterson" accessed these stories. However, Pogue admitted that if a third party had access to "user Joey Peterson's" password, then that person could have visited the sites.

Transcripts of eight of the pornographic stories were introduced into evidence. The transcribed stories had the following titles: "A Father's Love – Part Two," "Daddy Loves His Daughter," "Daddy and Daughter Amanda," "Amy and Her Daddy Part 3," "Bonding with Daddy," "A Step-Daughter of Lust," "Ashlee's Young Life," and "Ashlee's Young Life 2." Pogue stated that she read the transcribed stories and that the titles fit the narratives; they all depicted "inappropriate sexual behavior ... between an adult and a young child." However, Pogue's forensic examination did not reveal any child pornography on either the defendant's computer or smart phone.

Pogue also performed a forensic examination on A.A.'s computer. Pursuant to her examination, numerous links to the xnxx.com website were found.

A.A.'s sister, Lexi, was called by defense counsel to offer testimony. She testified that both she and A.A. initially had problems adjusting to having the defendant in their lives. Lexi stated that A.A. and the defendant fought "like cats and dogs," often getting into screaming arguments about A.A.'s messy room, about doing the dishes, and about hanging outside with her friends. Lexi believed that A.A. was sometimes scared of the defendant, even though A.A. never told Lexi she was afraid.

Lexi testified that A.A. never told her that the defendant was sexually abusing her. However, A.A. did tell Lexi that the defendant had shown her a rubber penis. Lexi estimated that she was told about the penis a week or so before A.A. reported the abuse to her teacher. Lexi admitted to initially doubting A.A.'s allegations, because A.A. was a little kid and would lie frequently about things like whether she cleaned her room or washed the dishes. Lexi stated that a part of her did not want to believe A.A. because they were living a great life.

Defense witness Alicia Mitchell, a supervisor with the Department of Children and Family Services, testified that her department investigates complaints of child sex abuse and that she was assigned to A.A.'s case. Mitchell stated that following the department's initial evaluation in 2012, the allegations were deemed to be invalid, the case was closed, and the mother was sent a letter to this effect. Two years later, on December 5, 2014, the department undertook a second investigation and deemed the allegations to be valid. Mitchell explained that it was not until 2014 that the department received the narrative of an interview with A.A. in which A.A. described the sexual abuse.

During the course of the trial, a voluminous amount of evidence was introduced into the record, including the video recordings and transcripts of A.A.'s

forensic interviews, A.A.'s medical records, computer forensic examinations and reports of the defendant's laptop and A.A.'s mini-computer, numerous photographs, and printouts of the pornographic stories found on the defendant's computer.[7]

Peterson went to trial before a judge on February 21 and 22, and March 9, 2018, and was found guilty on March 28, 2018.[8]   The trial court sentenced Peterson to twenty-five years imprisonment at hard labor to be served without the benefit of parole, probation or suspension of sentence, to be served concurrently.[9]

On direct appeal, Peterson's appointed counsel asserted two assignments of error: (1) the trial court erred in denying Peterson's motion *in limine* to exclude pornographic stories seized from his computer as they were protected by the First Amendment and were more prejudicial than probative; and (2) insufficient evidence supported the verdict.[10]

On January 8, 2020, the Louisiana Fourth Circuit affirmed Peterson's convictions and sentences.[11]   The court determined that there was sufficient evidence to support his convictions.[12] The court found that Peterson's possession of written stories depicting sexual abuse of minor females by their fathers or stepfathers indicated "a lustful disposition towards children, and, in particular, sexual inclinations towards young females living with or related to him," and fell within the exception of LA. CODE EVID. art. 412.2.[13]   The court further found that the evidence was not

---

[7] *State v. Peterson*, 289 So. 3d 93, 97-102 (La. App. 4th Cir. 1/8/20) (footnote omitted).

[8] No. 14-28238, St. R. Vol. 6 of 16, at 20-21, Trial Mins., 2/21/18; *id.*, at 22-23, Trial Mins., 2/22/18; *id.*, at 24-25, Trial Mins., 3/9/18; *id.*, at 26, Verdict Mins., 3/28/18; No. 17-1835, St. R. Vol. 14 of 16, at 5-6, Trial Mins., 2/21/18; *id.*, at 7-8, Trial Mins., 2/22/18; *id.*, at 9-10, Trial Mins., 3/9/18; *id.*, at 11, Verdict Mins., 3/28/18; St. R. Vol. 8 of 16, at 646-736, Trial Tr., 2/21/18; St. R. Vol. 9 of 16, at 737-849, Trial Tr. (con't), 2/21/18; *id.* at 849-986, Trial Tr., 2/22/18; St. R. Vol. 10 of 16, at 987-1112, Trial Tr. (con't), 2/22/18; *id.* at 1112-1236, Trial Tr., 3/9/18; St. R. Vol. 11 of 16, at 1237-1420, Trial Tr. (con't), 3/9/18.

[9] St. R. Vol. 6 of 16, at 28, Sentencing Mins., 8/8/18; St. R. Vol. 14 of 16, at 13, Sentencing Mins., 8/8/18; St. R. Vol. 15 of 16, at 13-18, Sentencing Tr., 8/8/18.

[10] St. R. Vol. 13 of 16, Appellate Brief, 2018-KA-1045, 2018-KA-1046, 7/25/19, at 17-21, 21-24.

[11] *State v. Peterson*, 289 So. 3d 93 (La. App. 4th Cir. 1/8/20)

[12] *Id.* at 102-04.

[13] *Id.* at 104-07.

more prejudicial than probative under LA. CODE EVID. art. 403, and, therefore, the trial court did

not abuse its discretion in allowing the evidence to be admitted.[14]  On July 31, 2020, the Louisiana

Supreme Court denied Peterson's related writ application without reasons.[15]

On December 7, 2020, the United States Supreme Court denied Peterson's petition for writ

of certiorari.[16]

## II.   <u>FEDERAL HABEAS PETITION</u>

On October 29, 2021, Peterson filed a petition for federal habeas corpus relief styled under

28 U.S.C. § 2254 and challenged his current custody.[17]  Peterson asserts the following claims

before the court:

> (1)     the evidence was insufficient to support the verdict beyond a reasonable
> doubt; and
>
> (2) the trial court erred in denying Peterson's motion *in limine* to exclude written
> materials seized from defendant's computer, as those materials were protected by
> the First Amendment and were more prejudicial than probative.[18]

The State filed a response in opposition to Peterson's petition and asserted that (1) Peterson

cannot overcome AEDPA's relitigation bar on either claim; (2) Peterson fails to establish that the

state court opinion resulted in a decision that was based on an unreasonable determination of facts

in light of the evidence presented; and (3) Peterson's claims are not cognizable on habeas review.[19]

Alternatively, the State asserts that Peterson's claims are meritless.[20]  Peterson filed a Response to

---

[14] *Id.* at 107.

[15] *State v. Peterson*, 300 So. 3d 398 (La. 7/31/20); St. R. Vol. 5 of 16, La. Sup. Ct. Order, 2020-KO-00248, 7/31/20; *id.*, La. Sup. Ct. Writ Application, 20 KO 248, 2/11/20.

[16] *Peterson v. Louisiana*, 141 S. Ct. 914 (2020).

[17] ECF No. 1.

[18] ECF No. 1, at 4, 5; ECF No. 1-1, at 4-13.

[19] ECF No. 13, at 11-15.

[20] *Id.* at 15-21.

the State's Answer claiming that the relitigation bar is not applicable to either of his claims and reiterating his earlier arguments.[21]

## III.   LAW AND ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996,[22] and applies to habeas petitions filed after that date.[23] The AEDPA therefore applies to Peterson's petition filed on October 29, 2021.[24]

The threshold questions in habeas review under AEDPA are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court. In other words, has the petitioner exhausted state court remedies and is the petitioner in "procedural default" on a claim.[25] Here, the State does not seek to time bar Peterson's federal habeas petition, nor does it claim that state court review has not been exhausted or that any claim is in procedural default.[26]

This federal habeas court is thus not barred from reviewing Peterson's claims. Nevertheless, for the reasons that follow, Peterson is not entitled to federal habeas relief.

---

[21] ECF No. 14, at 2-5, 5-11.

[22] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[23] *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).

[24] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379-380 (5th Cir. 1995). Peterson dated his signature October 29, 2021. ECF No. 1, at 8.

[25] *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

[26] ECF No. 13.

A. **Standards of a Merits Review**

Sections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law in federal habeas corpus proceedings.[27] Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[28]  The statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1).  The determination receives deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"[29]  The United States Supreme Court has clarified the § 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[30]

---

[27] *Nobles*, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

[28] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)).

[29] *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000) (brackets in original) (quoting *Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000)), *aff'd in part, rev'd in part on other grounds*, 532 U.S. 782 (2001); *Hill*, 210 F.3d at 485.

[30] *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Penry*, 532 U.S. at 792-93  (citing *Williams*, 529 U.S. at 405-06, 407-08); *Hill*, 210 F.3d at 485.

11

The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."[31]   "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"[32]

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"[33]   Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."[34]   The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.[35]

**B. AEDPA Standards of Review Apply in this Case**

As discussed above, the AEDPA's deferential standards of review under § 2254(d) and *Williams*[36] apply only to claims adjudicated on the merits by the state courts.  28 U.S.C. § 2254(d).  Thus, the deferential AEDPA standards of review do not apply to claims that are not adjudicated

---

[31] *White v. Woodall*, 572 U.S. 415, 427 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)); *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (quoting *Harrington*, 562 U.S. at 103).

[32] *White*, 572 U.S. at 426 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)); *Shoop*, 139 S. Ct. at 509 (habeas courts must rely "strictly on legal rules that were clearly established in the decisions of this Court at the relevant time.")

[33] *Price v. Vincent*, 538 U.S. 634, 641 (2003) (brackets in original) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (citations omitted)).

[34] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

[35] *Price*, 538 U.S. at 641 (*quoting Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

[36] 529 U.S. at 362.

on the merits in state court.[37]  In that instance, the federal habeas court will consider the claims

(not addressed on the merits) under pre-AEDPA *de novo* standards of review.[38]

   To determine whether to apply the highly deferential AEDPA standards, a federal habeas

court must look to the last reasoned state court decision to determine whether that ruling was on

the merits of the claim and "lack[ed] in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."[39]  Under well-

settled Supreme Court doctrine, when faced with an unexplained state court decision, the federal

habeas court "should 'look through' the unexplained decision to the last related state-court decision

providing" particular reasons, both legal and factual, "presume that the unexplained decision

adopted the same reasoning," and give appropriate deference to that decision.[40]

## IV.   PETERSON'S SPECIFIC CLAIMS

### A.   Claim One: Insufficient Evidence

   Peterson alleges that the evidence was insufficient to support the verdict.  He claims that

the victim was not credible, her testimony conflicted with testimony of the other witnesses, and

her allegations are completely uncorroborated.  While he concedes that the evidence presented at

trial, if believed, satisfied the elements of aggravated incest, he asserts that no rational trier of facts

would have credited the evidence beyond a reasonable doubt.

---

[37] *Cullen v. Pinholster,* 563 U.S. 170, 185-86 (2011); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003).

[38] *Henderson*, 333 F.3d at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims asserted in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 252-53 (5th Cir. 2009).

[39] *White v. Woodall*, 572 U.S. 415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86,103 (2011)).

[40] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when last state court judgment does not indicate whether it is based on procedural default, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

In opposition, the State asserts that there was ample evidence to support the verdict and that Peterson fails to identify any federal law to support his claim that the voluminous testimony and evidence is categorically insufficient.

Peterson raised an insufficiency of the evidence claim on direct appeal. The Louisiana Fourth Circuit found:

> In evaluating the sufficiency of the evidence to sustain a conviction, this Court applies the standard of review set forth by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789. In applying this standard, this Court must consider the record as a whole, as the rational trier of fact would do. *Brazell*, 17-0032, p. 10, 245 So.3d at 26-27. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, even one witness's testimony, if believed by the rational trier of fact, is sufficient to support a factual conclusion. *State v. Alverez*, 13-1652, p. 6 (La. App. 4 Cir. 12/23/14), 158 So.3d 142, 148 (citing *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79); *see State v. Summers*, 10-0341, p. 7 (La. App. 4 Cir. 12/1/10), 52 So.3d 951, 955 ("The testimony of the victim alone is sufficient to establish the elements of the offense.").
>
> The reviewing court is "not permitted to second guess the rational credibility determination" of the trier of fact, nor is it the function of the appellate court to reweigh the evidence. *State v. Kelly*, 15-0484, p. 3 (La. 6/29/16), 195 So.3d 449, 451. The determination of witness credibility is a question of fact within the sound discretion of the trier of fact that shall not be disturbed unless clearly contrary to the evidence. *Id.* (citing *State v. Vessell*, 450 So.2d 938, 943 (La. 1984). If, upon review of the record, the appellate court concludes that rational triers of fact could disagree as to the interpretation of the evidence, then the rational trier's view of all the evidence most favorable to the prosecution must be adopted. *State v. Miner*, 14-0939, p. 6 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 136. "Only irrational decisions to convict by the trier of fact will be overturned." *State v. Winston*, 11-1342, p. 8 (La. App. 4 Cir. 9/12/12), 100 So.3d 332, 337 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988).
>
> Thus, in this case, the relevant question for this Court to determine the sufficiency of the evidence is whether, after viewing the evidence in this case in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime of aggravated incest, La. R.S. 14:78.1, beyond a reasonable doubt. At the time the offenses occurred, La. R.S. 14:78.1 defined aggravated incest, in pertinent part, as follows:

A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

B. The following are prohibited acts under this Section:

(1) Sexual intercourse, sexual battery, second degree battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile or a person with a physical or mental disability, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.

(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

In this case, the trial court found the defendant guilty under La. R.S. 14:78.1(B)(1) by indecent behavior with the juvenile A.A., and under La. R.S. 14:78.1(B)(2) by lewd fondling or touching of A.A.  Indecent behavior with a juvenile, as an offense under La. R.S. 14:81, is defined as follows:

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the persons.  Lack of knowledge of the child's age shall not be a defense; or

(2) The transmission, delivery or utterance of any textual, visual, written, or oral communication depicting lewd or lascivious conduct, text, words, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.

The testimony adduced at trial indicated that the victim, A.A., was nine years old in October 2012, when she first reported being sexually abused by the

defendant, her stepfather, as verified by the marriage certificate reflecting that he and A.A.'s mother were married on July 23, 2008.  Thus, the record established the requisite relationship and age difference between the defendant and A.A., under La. R.S. 14:78.1(A).

Further, A.A. provided testimony describing lewd fondling and touching by the defendant of her genitals and being directed by the defendant to touch his genitals with the intention of arousing and gratifying him sexually.  A.A. testified that this abuse began "a couple of years" prior to and until her first reporting in October 2012, and that the abuse occurred again when the defendant returned to live in the residence in December 2012, through the summer of 2013.  A.A. testified that the abuse occurred more than five times.  This testimony, if believed by a rational trier of fact, is sufficient to establish the elements of La. R.S. 14:78.1(B)(2).

In addition to the sexual abuse by lewd fondling and touching, A.A. testified that the defendant often made her watch pornography on his laptop computer and showed her images of him and her mother naked, in sexual situations.  Additional testimony from the mother, stating that she and the defendant would watch pornography on his laptop computer, and from Pogue, the digital forensic examiner, stating that pornographic websites and pornographic written materials were accessed and downloaded by "user Joey Peterson" to his laptop computer, provided corroboration of A.A.'s testimony.  This testimony, if believed by a rational trier of fact, is sufficient to establish the elements of indecent behavior with juveniles, under La. R.S. 14:81(A)(2), and, moreover, the elements of aggravated incest, under La. R.S. 14:78.1(B)(1).

Several more trial witnesses provided testimony regarding A.A.'s reports of the sexual abuse by the defendant, including her teacher, the school nurse, the forensic interviewer, and the pediatrician who examined her.  Although the defendant argues that A.A.'s testimony was uncorroborated by the results of her physical examination and was internally inconsistent regarding the exact dates of the abuse, the testimony of several witnesses reflected the consistency of A.A.'s statements regarding the abuse by the defendant.  Moreover, Dr. Wetsman testified that it is not unusual for the physical examination of a child sex abuse victim to be "normal" and for the child who has been sexually abused multiple times to have difficulty recalling the details of each instance of sexual abuse.

In consideration of all the witness testimony and evidence introduced at trial, the trial court concluded that the sexual abuse of A.A. by the defendant had occurred as reported and that all essential elements of the charged offenses of aggravated incest, under La. R.S. 14:78.1(B)(1) and (2) were established.  Upon our review of the whole record, and viewing the evidence in the light most favorable to the prosecution, we find that the evidence was sufficient to convince the trial

court that all of the essential elements of the offense of aggravated incest had been proved beyond a reasonable doubt.[41]

Peterson sought review of the Louisiana Fourth Circuit decision, and the Louisiana Supreme Court denied writs without reasons.[42]

A federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.[43]  As the Supreme Court explained:

> [T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[44]

Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."[45]

To determine whether commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.[46]  The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.[47]  A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of

---

[41] *Peterson*, 289 So. 3d at 102-04.

[42] *Peterson*, 300 So. 3d 398 (La. App. 4th Cir. 7/31/20); St. R. Vol. 5 of 16, La. Sup. Ct. Order, 2020-KO-00248, 7/31/20.

[43] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).

[44] *Jackson,* 443 U.S. at 319 (emphasis in original) (internal quotation marks and citations omitted).

[45] *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

[46] *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U. S. at 324 n.16).

[47] *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (*Jackson* standard relies "upon the record evidence adduced at the trial.") (quoting *Jackson*, 443 U.S. at 324).

the credibility of witnesses in place of the fact-finder.[48]  Thus, review of the sufficiency of the

evidence does not include review of the weight of the evidence or the credibility of the witnesses,

because those determinations are the exclusive province of the jury.[49]  All credibility choices and

conflicting inferences must be resolved in favor of the verdict.[50]  Again, "[t]he *Jackson* inquiry

'does not focus on whether the trier of fact made the correct guilt or innocence determination, but

rather whether it made a rational decision to convict or acquit.'"[51]

A claim of insufficient evidence presents a mixed question of law and fact.[52]  Therefore,

this court must examine whether the state courts' denial of relief was contrary to or an unreasonable

application of United States Supreme Court precedent.

Peterson was charged with and convicted of three counts of aggravated incest.  Aggravated

incest requires proof that the defendant had a familial relationship with the victim.[53]  LA. REV.

STAT. § 14:78.1(B)(1) prohibited any indecent behavior with a juvenile.  Indecent behavior with a

juvenile is defined by LA. REV. STAT. § 14:81 as follows:

> A. Indecent behavior with juveniles is the commission of any of the following acts
> with the intention of arousing or gratifying the sexual desires of either person:
>
> (1) Any lewd or lascivious act upon the person or in the presence of any child under
> the age of seventeen, where there is an age difference of greater than two years
> between the persons.  Lack of knowledge of the child's age shall not be a defense;
> or

---

[48] *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

[49] *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

[50] *Ramirez v. Dretke*, 398 F.3d 691, 694-695 (5th Cir. 2005).

[51] *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)).

[52] *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

[53] *See* LA. REV. STAT. § 14:78.1(A).

> (2) The transmission, delivery or utterance of any textual, visual, written, or oral communication depicting lewd or lascivious conduct, text, words, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.

"Lewd" is defined as "lustful, indecent lascivious, and signifies that form of immorality which has relation to sexual impurity or incontinence carried on in a wanton manner."[54] "Lascivious" is defined as "tending to excite lust, lewd, indecent, obscene, relating to sexual impurity, tending to deprave the morals in respect to sexual relations."[55] LA. REV. STAT. § 14:78.1(B)(2) prohibits lewd fondling or touching of the person of the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

The elements of a sex crime and a petitioner's guilt of such a crime can be established through the victim's testimony, and the victim's testimony alone is generally sufficient evidence to support a conviction.[56]

Here, there is no dispute that A.A. was Peterson's stepdaughter and that he is at least two years older than her.[57] The remaining elements of the crimes were clearly established through the victim's testimony as well as through the testimony of other witnesses and the voluminous documentary evidence.

---

[54] *State v. Holstead*, 354 So. 2d 493, 497 (La. 12/27/97).

[55] *Id.* (citing Black's Law Dictionary (DeLuxe Ed.)).

[56] *Peters v. Whitley*, 942 F.2d 937, 941-42 (5th Cir. 1991); *see also Fetterley v. Whitley*, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); *Johnson v. Cain*, No. 16-927, 2017 WL 5176386, at *15 (E.D. La. Apr. 25, 2017), *adopted*, 2017 WL 5157604 (E.D. La. Nov. 7, 2017); *Craddock v. Cain*, No. 10-2044, 2014 WL 2083115, at *11 (E.D. La. May 19, 2014); *Stogner v. Cain*, No. 12-2703, 2013 WL 2444667, at *11 (E.D. La. June 4, 2013).

[57] The victim's mother testified that she and Peterson were married on July 10, 2008, and identified the marriage license, which was admitted into evidence. St. R. Vol. 10 of 16, at 1013, 1015-16, Trial Tr., 2/22/18. A.A. testified that she was nine years old in October 2012. St. R. Vol. 9 of 16, at 855, Trial Tr., 2/22/18.

Captain Mark Plumer of the Plaquemines Parish Sheriff's Office testified that on October 19, 2012, he responded to a call from the Belle Chasse Primary School that a child had disclosed sexual abuse to a teacher.[58]  According to Plumer, A.A., the victim, stated that she was being sexually abused by her stepfather for the last year.[59]  The victim explained that Peterson had shown her pornographic videos and images from his computer.[60]  After securing a warrant, Plumer served the search warrant for Peterson's residence.[61]  In addition to seizing a computer and external hard drive, he located a box of sex toys in a closet as well as pornographic videos and a sex toy in a bedside table drawer.[62]  He confiscated Peterson's computer.[63]  Plumer recalled that the victim's school counselor emailed him in December 2012 and advised that the victim told her that Peterson had come to the house on December 3, 2012, and that the victim was uncomfortable and did not know how to act.[64]  According to the email, the victim said that Peterson confronted her and asked her, "why did you tell?" and said, "that was supposed to be our secret."[65]  The victim also complained that Peterson attended her performance at the Orange Festival.[66]  Plumer recalled that Peterson came in for a polygraph, but had some muscle twitching in his neck and arms in the pre-interview which caused the examiner to cancel the examination.[67]

The State also presented the testimony of Tracey Brunetti, a former forensic interviewer for the Children's Advocacy Center, who interviewed the victim, who was nine years old at the

---

[58] St. R. Vol. 8 of 16, at 673, Trial Tr., 2/21/18.
[59] *Id.* at 673; *see also id.* at 725 (indicating abuse was for the last year).
[60] *Id.* at 675.
[61] *Id.* at 674.
[62] *Id.* at 678-79.
[63] *Id.* at 685.
[64] *Id.* at 719-20.
[65] *Id.* at 720.
[66] *Id.*
[67] *Id.* at 722, 725.

time, on October 22, 2012.[68]  A video of the interview was played for the trial judge.[69]  Brunetti identified the anatomical drawings used during the interview, which were signed by A.A. and Brunetti.[70]  According to Brunetti, A.A. told her that her stepfather "sex abused" her, and that she learned those words from the news.[71]  A.A. told her that the sexual abuse occurred on multiple occasions.[72]  Brunetti explained that the victim used hand gestures to indicate that Peterson put his fingers and his penis inside her vagina.[73]  She further explained that the victim used hand gestures to show that she put her hand on Peterson's penis and moved it up and down.[74]  The victim complained that Peterson constantly showed her pornographic videos.[75]

Erin Cosse, A.A.'s fourth grade teacher, testified that she noticed that the week of October 19, 2012, the victim's behavior had changed and she was constantly breaking classroom rules.[76] She recalled that A.A. was usually well groomed, but her hair was a mess.[77]  Cosse questioned A.A. to determine what was causing her to act out.[78]  A.A. asked to speak to Cosse outside the classroom.[79]  In the hallway, A.A. told Cosse that her dad "sex-abuses" her.[80]  When Cosse sought to clarify whether A.A. was speaking of her father or her stepfather, the victim said, "Joey."[81] Cosee brought A.A. to the school nurse.[82]  Cosse testified that after Peterson moved back into the

---

[68] *Id.* at 731; St. Rec. Vol. 9 of 16, at 741, Trial Tr., 2/21/18.
[69] St. Rec. Vol. 8 of 16, at 735, Trial Tr., 2/21/18.
[70] *Id.* at 735-36; St. Rec. Vol. 9 of 16, at 737, Trial., 2/21/18
[71]  St. Rec. Vol. 9 of 16, at 744, Trial., 2/21/18
[72] *Id.* at 765.
[73] *Id.* at 740, 755.
[74] *Id.* at 741.
[75] *Id.* at 745, 750, 751.
[76] *Id.* at 771.
[77] *Id.* at 799.
[78] *Id.* at 771, 777.
[79] *Id.* at 771.
[80] *Id.*
[81] *Id.* at 773.
[82] *Id.* at 773-74.

family home, A.A.'s behavior intensified and her conduct grade went down.[83]  She explained that A.A. spoke out of turn, did not follow directions, interfered with instructions, and fell asleep in class.[84]

The trial judge also heard from Rebecca Amos, the former school nurse, who spoke with A.A. after Cosse brought her to the nursing office.[85]  A.A. told Amos that her stepfather was sexually abusing her.[86]  A.A. explained that Peterson showed her videos of men and women naked together.[87]  A.A. also told her that Peterson "touches [her] with [her] clothes off."[88]  A.A. told Amos that she spoke to her mother about the situation and that mother told her she would try to get things together to move somewhere else, but warned her not to speak to anyone outside the house about it.[89]  A.A. told Amos that she also told her sister, and her sister told her to "stop saying that stuff."[90]  Amos recalled that A.A. frequently came to her office that week with complaints of stomach ache and back ache.[91]  Amos contacted the school social worker and advised that she felt that A.A. was in danger of going home, and that she was calling the police.[92]  Amos recalled that, in the police's presence, the victim's mother admitted that A.A. had told her about the sexual abuse.[93]

Holly Eiswirth, the school counselor, testified that, sometime after A.A. returned to school after her October 2012 allegations, A.A. was upset because Peterson attended her cheerleading

---

[83] *Id.* at 795-96.
[84] *Id.* at 796.
[85] *Id.* at 810.
[86] *Id.*
[87] *Id.* at 810-11, 817.
[88] *Id.* at 817.
[89] *Id.* at 811, 818.
[90] *Id.* at 812.
[91] *Id.* at 812-14.
[92] *Id.* at 820.
[93] *Id.* at 825-26.

event and afterwards her mother took her to the firehouse where he worked for lunch.[94]  Eiswirth recalled that A.A. was also upset because Peterson's stepdaughter confronted her about the allegations, and because Peterson had returned home and told A.A. what had happened was supposed to be a secret.[95]  Amos emailed this information to a detective.[96]

Detective Holly Hardin testified that she coordinated and supervised a Children's Advocacy Center forensic interview of A.A. on March 22, 2017.[97]  A video recording of the interview was played for the trial judge.[98]

A.A. was fifteen years old at the time of trial, and testified that Peterson had been sexually abusing her from a couple of years before she told her teacher on October 19, 2012.[99]  She explained that Peterson would touch her vagina under her clothes and make her touch him on his penis.[100]  She recalled that a couple of times he attempted to put her penis in her vagina.[101]  Peterson showed A.A. pornography on his computer.[102]  She recalled a video of people having sex and that Peterson asked her questions about it.[103]  Peterson also showed her a slideshow of pictures of her mother and him in sexual situations.[104]  Peterson would have A.A. put on a robe with nothing underneath and lay next to him.[105]  A.A. explained that Peterson would touch himself and white "stuff" would come out.[106]  Peterson told her not to tell anyone, but that eventually A.A. told her

---

[94] *Id.* at 834-35.
[95] *Id.* at 835, 837.
[96] *Id.* at 838-39.
[97] *Id.* at 843-44.
[98] *Id.* at 845.
[99] *Id.* at 853, 855.
[100] *Id.* at 856-57.
[101] *Id.* at 858.
[102] *Id.*
[103] *Id.* at 889-90.
[104] *Id.* at 858-59.
[105] *Id.* at 859.
[106] *Id.*

mother that he was making her watch pornographic videos.[107] A.A. recalled that her mother talked to Peterson, and the sexual abuse stopped for a while, but then it started again.[108] A.A. recalled that she told her mother that Peterson touched her.[109]

Peterson moved out after she reported him to her teacher, but he moved back in a few months later.[110] A.A. recalled that, at some point, Peterson began sexually abusing her again.[111] A.A. specifically recalled the first incident after Peterson moved back into the home was during the summer of 2013 and involved Peterson touching her with his hands[112] A.A. recalled finding sex toys in the closet.[113] A.A. did not disclose that Peterson had sexually abused her after he moved back into the house until a meeting with the Attorney General's Office.[114]

Dr. Ellie Wetsman interviewed A.A. on November 7, 2012, at which time the victim told her she had been sexually abused.[115] An audio recording of the interview was played for the trial judge.[116] Wetsman examined and interviewed the victim again on March 22, 2017.[117] An audio recording of the interview was played for the trial judge.[118]

A.A.'s mother admitted that the victim told her Peterson was showing her pornography.[119] She admitted that she did not want to believe A.A.'s allegations.[120] A.A.'s mother testified that

---

[107] *Id.* at 894, 912-13.
[108] *Id.* at 913.
[109] *Id.* at 917-18.
[110] *Id.* at 794-95, 859-60.
[111] *Id.* at 861.
[112] *Id.* at 861, 958.
[113] *Id.* at 962.
[114] *Id.* at 963-94.
[115] St. R. Vol. 10 of 16, at 996-97, Trial Tr., 2/22/18.
[116] *Id.* at 999-1000.
[117] *Id.* at 1004.
[118] *Id.* at 1005.
[119] *Id.* at 1019, 1039-40.
[120] *Id.* at 1019-20, 1058-59, 1061.

she observed Peterson watching pornography in the bedroom on his computer, and that she sometimes would watch with him.[121]

Tran Buie Pogue, a digital forensic examiner, examined Peterson's laptop computer and external hard drive.[122]  The internet history showed visited links for pornographic websites including xnxx.com.[123]  Pogue found over fifty links for pornographic stories involving activity with young children or step daughters.[124]  Pogue testified regarding eight of the pornographic stories.[125]  Backups for an iPhone under the name "Joey's phone" were found on Peterson's computer[126]  The iPhone backups included internet history and bookmarks for the xnxx website.[127]  Pogue also analyzed the victim's mini laptop and found that the xxnx website had been accessed many times.[128]

The defense presented multiple witnesses in an attempt to discredit A.A.'s allegations. Peterson's former son-in-law, was present when Peterson, his adult daughter, and he delivered a puppy to the home in December 2012.[129]  He recalled that A.A. was in her room and stayed in it most of the time.[130]  He claimed that A.A. came out of her room for two to three minutes.[131]  He claimed that his former wife never left his presence and did not speak to A.A.[132]  He did not see Peterson leave the room.[133]

---

[121] *Id.* at 1035.
[122] St. R. Vol. 10 of 16, at 1115-16, Trial Tr., 3/9/18.
[123] *Id.* at 1117, 1119.
[124] *Id.* at 1121-25.
[125] *Id.* at 1126.
[126] *Id.* at 1129.
[127] *Id.* at 1130.
[128] *Id.* at 1140-42.
[129] *Id.* at 1098-1100.
[130] *Id.* at 1101.
[131] *Id.* at 1103.
[132] *Id.* at 1101-02.
[133] *Id.* at 1102.

Peterson's adult daughter accompanied Peterson to the home to deliver the puppy.[134]  She recalled that A.A. came out of her room for a few minutes.[135]  Peterson's daughter claimed that she did not go into A.A.'s nor did she speak to her.[136]

Lexi, A.A.'s sister, denied that the victim had ever told her Peterson was sexually abusing her.[137]  She recalled that A.A. told her that Peterson had showed her a rubber penis.[138]  Lexi denied that A.A. told her that Peterson showed her pornography and was touching her inappropriately and did not recall telling A.A. to stop making allegations.[139]  She admitted that A.A. and Peterson fought often.[140]  Lexi could not recall whether Peterson came into the house the night be delivered the puppy.[141]  She admitted that she previously told an investigator that A.A. lied a lot.[142]

A.A.'s mother admitted that A.A. had lied about "minor things" in the past such as cleaning her room, washing her clothes, taking a bath and washing her hair.[143]  She admitted that Peterson and A.A. continued to fight after he moved back in.[144]  She, however, testified that A.A. had no reason to lie about the sexual abuse as they had suffered significant financial hardship since her allegations.[145]

---

[134] *Id.* at 1105-07.
[135] *Id.* at 1107.
[136] *Id.* at 1107-08.
[137] *Id.* at1202-03, 1205, 1224.
[138] *Id.* at 1203.
[139] *Id.* at 1204-05, 1224.
[140] *Id.* at 1198-99, 1202, 1216-19.
[141] *Id.* at 1225-26.
[142] St. R. Vol. 11 of 16, at 1240, Trial Tr. (con't), 3/9/18.
[143] *Id.* at 1254, 1264.
[144] *Id.* at 1261, 1263.
[145] *Id.* at 1263.

A.A.'s father recalled a meeting on July 17, 2013 with the Attorney General's Office.[146] He had suffered multiple strokes since that time and did not recall that he said he learned that A.A. had watched pornographic videos over Peterson's back when he was on his computer.[147]

Willie Spears, Jr., a retired criminal investigator for the Attorney General's Office was present at a June 17, 2013 meeting with A.A. and her family.[148] He recalled that the victim's mother said that A.A. lied a lot and that she thought that A.A. was lying.[149] Spears testified that A.A.'s mother and sister could not or would not believe A.A.'s accusations.[150] A.A.'s father told Spears that he learned that A.A. had watched pornography over Peterson's back when he was on the computer.[151] A.A.'s father accused A.A.'s mother of attempting to intimidate A.A. from testifying.[152] He told Spears that A.A.'s mother and Peterson took A.A.'s phone and computer and told her they would lose the house and she was going to be "begging with nothing to eat."[153]

Alicia Mitchell, a Children's Protective Services supervisor, reviewed the report of an investigator who was assigned to investigate whether A.A.'s October 2012 allegations were valid.[154] The agency originally determined that the allegations were invalid, and the case was closed.[155] Mitchell testified that it was not until 2014 that the agency received information that a forensic interview had been done and that A.A. had disclosed sexual abuse.[156] Based on the

---

[146] *Id.* at 1270-73.
[147] *Id.* at 1273-78.
[148] *Id.* at 1283-86.
[149] *Id.* at 1288.
[150] *Id.* at 1289-91.
[151] *Id.* at 1294.
[152] *Id.* at 1295.
[153] *Id.* at 1297-98.
[154] *Id.* at 1302-03, 1308-09.
[155] *Id.* at 1309-10.
[156] *Id.* at 1311-13.

additional information, the allegations were found to be valid.[157]  Thereafter, there was a second investigation because A.A.'s mother had allowed Peterson to move back into the home despite being told that Peterson had showed A.A. pornography and A.A. had seen a sex toy on the nightstand.[158]  The second investigation was deemed valid, and the case was transferred to the family services unit for the family to receive services in regard to sexual abuse.[159]  Mitchell did not supervise the case relating to A.A.'s disclosure that Peterson had sexually assaulted her after moving back into the home.[160]

Detective Hardin conducted a second investigation in March 2017 after A.A. disclosed that Peterson had touched her inappropriately with his hand and had attempted to penetrate her with his penis.[161]  A.A. said "it hurt really bad," and she ran to her room and locked her door.[162]

Although Peterson claims that the victim made up her allegations and that her allegations were not consistent, challenges to the accuracy of witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and a reviewing court cannot reevaluate that credibility determination.[163]  A federal habeas court generally will not grant relief on an insufficient evidence claim premised on credibility issues.[164]

---

[157] *Id.* at 1309-11.

[158] *Id.* at 1316, 1318.

[159] *Id.* at 1318-19.

[160] *Id.* at 1323.

[161] *Id.* at 1325-26.

[162] *Id.* at 1327.

[163] *State v. Thomas*, 13 So. 3d 603, 607 (La. App. 5th Cir. 2008); *see also Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield v. Jones*, 903 F. Supp. 1011, 1018 (E.D. La. 1985) (habeas courts should defer to the jury's credibility determinations and justifiable inferences of fact.) (citing *United States v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)).

[164] *See Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); *McCowin v. Scott*, No. 93-5340, 24 F.3d 240, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); *Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012),

Further, a state court's decision denying a claim on the merits is considered "unreasonable" only when it runs afoul of the law as set forth by the United States Supreme Court. If the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."[165] Here, Peterson has not identified – and this Court's independent research has not uncovered – a United States Supreme Court case with evidence analogous to that presented in the instant case in which the Supreme Court determined that the *Jackson* standard was unmet.

In summary, viewing the evidence in the light most favorable to the prosecution in accordance with *Jackson*, the State presented sufficient evidence for a reasonable trier of fact to conclude that the each element of aggravated incest was established. Therefore, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

B.    **Claim Two: Admission of Pornographic Stories**

Peterson asserts that the trial court erred in denying his motion *in limine* to prohibit the admission into evidence of pornographic stories found on his computer. He claims that the possession of such materials is protected under the First Amendment and that the evidence was unduly prejudicial.

The State responds that Peterson's claim of violation of state law is not cognizable on federal habeas review. It further claims that probative value of the evidence outweighed the danger

---

adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); *Picou v. Cain*, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

[165] *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

of undue prejudice and that there was no risk of confusion of the issues or misleading the trier of

fact as Peterson had a bench trial.

Peterson's claim that the trial court erred in admitting the evidence was considered and

rejected by the state courts on direct appeal.  In denying the claim in the last reasoned opinion,

the Louisiana Fourth Circuit reasoned:

> We now turn to the defendant's first assigned error, arguing that the trial
> court erred in denying his motion to exclude from trial the written pornographic
> stories, seized from the defendant's computer.  The defendant asserts that the trial
> court committed reversible error in admitting the pornographic stories into evidence
> at trial.
>
> Prior to trial, the defendant filed a motion to exclude written pornographic
> stories that were discovered on his laptop computer, seized pursuant to the search
> warrant of the residence.  In his motion, the defendant admitted that the
> pornographic stories depict illegal sexual abuse of minors, but he asserted that none
> of the materials seized from his computer constituted illegal child pornography and
> that the stories constituted protected free speech under the First Amendment of the
> United States Constitution.  Further, the defendant argued that such evidence was
> inadmissible character evidence under La. C.E. art. 404(B)(1), because his
> possession of the stories is not probative of any criminal acts and would be used
> only to attack his character and credibility.  Finally, the defendant argued that the
> evidence must be excluded ultimately under La. C.E. art. 403, because the danger
> of unfair prejudice substantially outweighed any probative value of the evidence as
> it relates to the charged offenses.
>
> In response, the State argued that the written pornographic stories, which
> specifically depicted sexual abuse of minor females by their fathers/stepfathers,
> were admissible under La. C.E. art. 404(B)(1), as proof of the defendant's intent
> and motive to sexually abuse his stepdaughter, and under La. C.E. art. 412.2, as
> evidence indicating the defendant's lustful disposition toward minor females.
>
> After a lengthy hearing on the defendant's motion, the trial court deferred
> ruling on the admissibility of the pornographic stories until trial.  Subsequently,
> during the trial testimony of Pogue, the digital forensic examiner, the trial court
> admitted eight of the stories found on the defendant's computer into evidence, over
> the defendant's objection.  The record indicates that the trial court admitted the
> evidence under La. C.E. art. 412.2.
>
> On appeal, a trial court's ruling on the admissibility of evidence is reviewed
> under an abuse of discretion standard and will not be overturned absent a clear
> abuse of discretion.  *State v. Klein*, 18-0022, p. 19 (La. App. 4 Cir. 8/22/18), 252

30

So.3d 973, 985; *State v. Wright*, 11-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316.

Generally, all relevant evidence is admissible at trial; that is, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. arts. 401, 402. Evidence that is not relevant is not admissible. La. C.E. art. 402. Additionally, evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." La. C.E. art. 403. When an accused argues that certain evidence should be excluded, pursuant to La. C.E. art. 403, because the probative value is substantially outweighed by the danger of unfair prejudice, a trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by the potential prejudicial effect. *State v. Dove*, 15-0783, p. 29 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, 112.

However, the trial court may not admit evidence of other crimes, wrongs, or acts committed by the defendant for purposes of showing the defendant as a man of bad character who has acted in conformity therewith. La. C.E. art. 404(B)(1); *State v. Rose*, 06-0402, p. 12 (La. 2/22/07), 949 So.2d 1236, 1243. Our jurisprudence recognizes that, in general, evidence of other crimes, wrongs, or acts committed by the defendant poses a "substantial risk of grave prejudice to the defendant." *Klein*, 18-0022, p. 18, 252 So.3d at 985; *State v. Williams*, 96-1023, p. 30 (La. 1/21/98), 708 So.2d 703, 725; *State v. Prieur*, 277 So.2d 126, 128 (La. 1973). However, La. C.E. art. 404(B)(1) provides exceptions to the general rule of inadmissibility, when the evidence sought to be admitted provides proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or "when the evidence relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." *Klein*, 18-0022, p. 18, 252 So.3d at 985.

In addition, as recognized by Louisiana jurisprudence, a further exception to the general rule against the admission of other crimes, wrongs, or acts evidence was created by the Louisiana Legislature through the enactment of La. C.E. art. 412.2, which provides:

A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

In *State v. Wright*, the Louisiana Supreme Court recognized that "Article 412.2 was enacted to loosen restrictions on 'other crimes' evidence, and to allow evidence of 'lustful disposition' in cases involving sexual offenses." 11-0141, p. 13 (La. 12/6/11), 79 So.3d 309, 317. "Thus, evidence of defendant's other acts which involve sexually assaultive behavior or acts which indicate his lustful disposition towards children may be admissible." *Wright*, 11-0141, p. 11, 79 So.3d at 316 (holding other crimes/acts evidence admissible under La. C.E. art. 412.2 as it demonstrated the defendant's propensity for sexual activity with adolescents where he held a position of authority, and where the adolescent children were in his household).

In *State v. Farrier*, 14-0623 (La. App. 4 Cir. 3/25/15), 162 So.3d 1233, the defendant was convicted of sexual battery of an unrelated, six-year old girl who resided with him in the same home; on appeal, he argued that the trial court erred in admitting a jailhouse telephone recording, in which he made statements about watching child pornography, because it was substantially more prejudicial than probative under La. C.E. art. 403. In reviewing the admissibility of the evidence, this Court discussed the applicability of La. C.E. art. 404(B)(1) and the exception within La. C.E. art. 412.2 to the facts of the case, stating as follows:

> Unquestionably, Mr. Farrier has been charged with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense. As charged here, the specific offense for which Mr. Farrier was on trial required the prosecution to prove beyond a reasonable doubt that Mr. Farrier intentionally touched the anus or genitals of [victim] without her consent. *See* La. R.S. 14:43.1A(1). And, of course, Mr. Farrier is an adult male, and [victim] was six years old at that time.
>
> Here, the recording speaks directly to Mr. Farrier's lustful disposition towards children. Notably, in this conversation, Mr. Farrier does not tell his listener that the allegations of him watching child pornography are false; he is loudly silent about the truth of the allegations and instead cannot fight "this" and hopes for leniency as "a first offender." Mr. Farrier's statements are also relevant to his prosecution to confirm [victim's] videotaped forensic interview and testimony at trial that Mr. Farrier would show her child pornography and then have [victim] imitate what was done on the video.

*Farrier*, 14-0623, pp. 14-15, 162 So.3d at 1243. Under the facts of the case, given that the defendant's other acts/statements indicated a lustful disposition toward children, this Court found that the trial court did not abuse its discretion in finding that the evidence did not warrant exclusion under La. C.E. art. 403 and allowing the admission of the jailhouse call. *Id.*

Also, in *State v. Klein*, *supra*, this Court found no abuse of discretion in the trial court's admission of other crimes evidence, under La. C.E. art. 412.2, at the trial of the defendant charged with multiple counts of child pornography. The defendant argued that the trial court erred in allowing testimony from his adult children that they were sexually abused by the defendant as young children. The defendant argued that, because the charged offenses of possession of child pornography are more passive and less violent than the sexual abuse described in the testimony of his children, any probative value of the testimony was substantially outweighed by the prejudicial effect. This Court disagreed; in particular, this Court noted that "[t]he behavior depicted on the videos is strikingly similar to the acts described by [defendant's adult children]." *Klein*, 18-0022, p. 21, 252 So.3d at 986.

In this case, as admitted by the defendant, the written stories depict illegal sexual abuse of minor females by their fathers or stepfathers. While we acknowledge that the defendant's possession of written stories depicting sexual abuse is not illegal, the acts and behavior depicted within the stories bare a noticeable similarity to the charged offenses in this case. His possession of these pornographic stories involving minor children indicates, generally, a lustful disposition towards children and, in particular, sexual inclinations towards young females living with or related to him. Thus, under the facts and circumstances of this case, the evidence would fall within the exception provided by La. C.E. art. 412.2, as found by the trial court.

We also do not find the evidence to be more prejudicial than probative under La. C.E. art. 403. Regarding the balancing between the probative value of evidence and the danger of unfair prejudice, the Louisiana Supreme Court has stated, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from the proof specific to the offense charged." *Wright*, 11-0141, p. 15, 79 So.3d at 318 (quoting *Rose*, 06-0402, p. 13, 949 So.2d at 1244). In this case, the evidence admitted was relevant and probative to show the defendant's lustful disposition toward children, in particular a stepdaughter, in scenarios similar to those described by A.A. in her forensic interviews and in her testimony. Thus, we do not find this evidence to be extraneous. We also do not find that the admission of this evidence would "lure the factfinder" away from its duty to find proof beyond a reasonable doubt specific to the charged offense of aggravated incest of A.A. *See id.* Lastly, in consideration that this was a bench trial as requested by the defendant, we note that the trial judge is "trained in the law and is able to disregard irrelevant and possibly prejudicial matter." *State v. Crothers*, 278 So.2d 12, 15; *see State v. Herrin*, 562 So.2d 1, 7 (La. App. 1st Cir. 1990).

Based on our review of the evidence introduced at trial, in light of the applicable statutes and jurisprudence, we do not find that the trial court abused its discretion in allowing the written pornographic stories discovered on the defendant's computer to be admitted into evidence under La. C.E. art. 412.2. In addition, we do not find the trial court abused its discretion in finding the probative

value of the evidence outweighed its prejudicial effect. This assignment of error has no merit.[166]

To the extent Peterson argues that the evidence was admitted in violation of Louisiana law, that claim is not cognizable on federal habeas review.[167] Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.[168] States are free to implement procedures regarding the admission of evidence, provided those procedures do not infringe on a constitutional guarantee.[169]

Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair.[170] As the Fifth Circuit has explained, this high standard is not easily satisfied:

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
>
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.[171]

---

[166] *Peterson*, 289 So. 3d at 104-07 (footnote omitted).

[167] *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

[168] *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

[169] *Burgett v. Texas*, 389 U.S. 109 (1967).

[170] *Lisenba v. People of the State of California*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.).

[171] *Gonzales*, 643 F.3d at 430-31 (footnotes omitted).

This issue presents a mixed question of law and fact.[172]  Under the applicable standard of review, this Court therefore must determine if the state courts' decision is contrary to or involved an unreasonable application of Supreme Court precedent prohibiting an unfair trial.

As an initial matter, Peterson has failed to establish any error by the trial court which would trigger review under due process standards.[173]  The admission of the evidence was affirmed by the Louisiana Fourth Circuit as proper under state law.  The Louisiana Supreme Court has held that LA. CODE EVID. art. 412.2, under which the evidence was admitted, was enacted to lower the obstacles to admission of "propensity evidence" in sexual assault cases, especially those involving children.[174]  The Louisiana Supreme Court therein likened Article 412.2 to FED. R. EVID. 413.[175]

Both the state and federal rules are subject to the balancing test concerning probative value and prejudicial effect.[176]  Like the Louisiana courts with Article 412.2, the federal courts have noted that "Rule 413 is based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes, and often justifies the risk of unfair prejudice."[177]  Furthermore, federal courts have upheld the admission under FED. R. EVID. 404(b)

---

[172] *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

[173] *Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993) (where there is no showing of error by a trial court, there can be fundamental unfairness); *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

[174] *State v. Williams*, 830 So. 2d 984, 986-987 (La. 2002).

[175] FED. R. EVID. 413(a) provides as follows: "In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault.  The evidence may be considered on any matter to which it is relevant."  The terminology of Rule 413 was amended in 2011 for stylistic purposes only.  *See* Advisory Committee Notes, 2011 Amendments foll. FED. R. EVID. 413(a).

[176] *United States v. Dillon*, 532 F.3d 379, 387 (5th Cir. 2008) ("Evidence admissible under Rule 413 is still subject to the Rule 403 balancing test, so it may be excluded if its 'probative value is substantially outweighed by the danger of unfair prejudice.' ") (citing FED. R. EVID. 403); *State v. Hernandez*, 93 So. 3d 615, 629 (La. App. 5th Cir. 2012) (same with regard to LA. CODE EVID. art. 412.2).

[177] *United States v. Enjady*, 134 F.2d 1427, 1431 (10th Cir. 1998); *United States v. Guidry*, 456 F.3d 493, 502-03 (5th Cir. 2006) ("Because sexual assault allegations are often reduced to a swearing match, Congress aimed to assist the fact finder's assessment of credibility through allowing evidence of the defendant's extrinsic sexual misconduct as character or propensity evidence.") (citing *Enjady*, 134 F.2d at 1431).

of pornographic stories involving minors as relevant to an issue other than the defendant's character.[178]

In this case, the probative value of providing the pornographic stories on Peterson's computer far outweighed any potential prejudice. As determined by the Fourth Circuit, the evidence was relevant to show Peterson's lustful disposition towards children and sexual inclinations towards young females living with or related to him. The evidence was not presented in a confusing manner. Further, because it was a bench trial, it is unlikely that the trial judge was improperly influenced by the evidence, as the judge is presumed to know the law.

There is no indication in the record that the other crimes testimony and evidence misled the trial judge into reaching an improper verdict. Peterson has not demonstrated in the instant case that the other crimes evidence related the pornographic stories of sexual relations between fathers and their daughters and stepdaughters was inadmissible or rendered his trial fundamentally unfair. Because he has not demonstrated error in the admission of the evidence, he "has no basis for any alleged due process violation" or denial of a fundamentally fair trial.[179] Even if he had shown an error, the evidence was not so prejudicial as to violate due process standards.

The denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Peterson is therefore not entitled to relief as to this claim.

---

[178] *United States v. Naidoo*, 995 F.3d 367, 377-78 (5th Cir. 2021) (the trial court did not abuse its discretion in admitting evidence that the defendant's tablet device was used to access pornographic stories involving minors in child pornography trial); *United States v. Lee*, 701 F. App'x 175, 182-84 (3rd Cir. 2017) (admission in a child pornography trial of sexually explicit stories written by defendant were relevant to his motive, intent, and plan and was not an abuse of discretion); *United States v. Shaffer*, 472 F.3d 1219, 1126 (10th Cir. 2007) (trial court did not abuse its discretion in admitting written narrative found on the defendant's computer entitled "House of Incest").

[179] *Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir, 1993); *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Joseph Peterson's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[180]

New Orleans, Louisiana, this _____31st_____ day of August, 2022.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[180] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)).  *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).